THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROSENDO A. CABALLERO, Defendant-Appellant.

Third District   No. 3—90—0468

Opinion filed November 24, 1992.

Edward J. Kuleck, Jr., of Ottawa, for appellant.

Joseph Navarro, State's Attorney, of Ottawa (John X. Breslin and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendant Rosendo Caballero was indicted on charges of controlled substance trafficking (Ill. Rev. Stat. 1989, ch. 56½, par. 1401.1), calculated criminal drug conspiracy (Ill. Rev. Stat. 1989, ch. 56½, par. 1405), conspiracy (Ill. Rev. Stat. 1989, ch. 38, par. 8—2) and possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)). Following a bench trial, the defendant was found guilty of each of the charged offenses. The defendant received concurrent sentences of 36 years' imprisonment for trafficking, 30 years' imprisonment for calculated criminal drug conspiracy and 25 years' imprisonment for possession with intent to deliver, in addition to a street value fine of $36,600. No sentence was entered on the simple conspiracy conviction. Defendant raises the following issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt of controlled substance trafficking; (2) whether defendant's conviction for calculated criminal drug conspiracy was improper where one of the alleged conspirators was an agent of the State; (3) whether the defendant's conviction for conspiracy was barred by Wharton's Rule or preempted by the calculated criminal drug conspiracy statute; and (4) whether the defendant's sentence was excessive. For the reasons stated below, we affirm in part, reverse in part and remand.

The State's first witness, Charlene Bennett, testified that in mid-September of 1989, she was arrested after police raided her home and found 21 grams of cocaine in her possession. Bennett subsequently agreed to help the police obtain cocaine from the defendant, whom she had been purchasing cocaine from for at least two years. According to Bennett, she could not count the number of times she had gone to the airport in Chicago to get cocaine from the defendant. Defendant told her that his source of drugs was his family.

In the spring of 1989, the defendant resided in Bloomington, Illinois, with his wife, his daughter Elizabeth Valera and a son for approximately one month. It was at this time that Bennett was introduced to Valera by the defendant. Bennett again met Elizabeth Valera in the spring of 1989 at Midway airport when Valera brought Bennett cocaine. Bennett received three phone calls from Valera sometime after the Midway airport meeting concerning payment for the drugs. Bennett had no subsequent contact with Valera.

On September 7, 1989, Bennett picked up the defendant from Midway airport and took him to a motel in Ottawa, Illinois, where defendant gave her an ounce of cocaine. Bennett continued to get cocaine from the defendant between September 7 and September 15,

1989, by personal meetings with the defendant and through Federal Express. The return address on at least one of the Federal Express packages was Texas. In addition, Bennett stated that she would on occasion mail money to the defendant in New York or Texas.

On September 16, 1989, after she was arrested, Bennett went to the Streator police department, where she was outfitted with a recording device and given $1,000 so she could set up a controlled buy. Bennett and her boyfriend, William James, went to Ottawa and met with the defendant at a motel to arrange the transaction. Bennett gave the defendant $1,000 for cocaine she had purchased on September 15, 1989, and she asked him when he was going to get more cocaine. The defendant told Bennett that his wife was going to bring him three ounces that evening and that he would contact Bennett when it arrived. Defendant also told Bennett that he needed a ride to the airport, and James agreed to take him.

On cross-examination, Bennett testified that it was possible that her memory was diminished regarding the events that occurred between her and the defendant due to her cocaine addiction. She stated that she and James were using approximately three-quarters of an ounce of cocaine per day. Bennett also testified that during her dealings with the defendant, the defendant always sent money to his family for their support, and on September 16, 1989, he was unsuccessful in his attempt to send $1,000 to his family.

William James testified that he had lived with Bennett for the past four years in Streator, Illinois, and that he had known her for the past 16 years. On September 15, 1989, James went with Bennett to a motel in Ottawa where Bennett purchased three-quarters of an ounce of cocaine from the defendant. On September 16, 1989, James again went with Bennett to the motel after she was outfitted with a recording device and given $1,000 to set up a controlled buy. The defendant told them that his wife was coming with three ounces of cocaine at 7 p.m. that evening. The next morning the defendant called James and asked for a ride to Midway airport because his daughter was arriving on a flight. James picked up the defendant, who was carrying a manila envelope. James stopped at a gas station where defendant made a phone call and they then drove to Midway airport in Chicago. When they arrived, the defendant went into the airport and came out sometime thereafter with his daughter, Elizabeth Valera. The defendant had a leather jacket which he placed in the vehicle and he told James the cocaine was in the jacket. The defendant had not worn a jacket to the airport. The defendant and his daughter then returned to the terminal. James looked inside the jacket and saw

what appeared to be a bag of cocaine. The defendant later returned to the car and he and James drove back to Ottawa.

James further testified that he and Bennett had been purchasing cocaine from the defendant for two years prior to September 15, 1989. James picked up the defendant a number of times during those two years from an airport in Chicago. James and Bennett received at least one Federal Express package from Houston containing cocaine sent in the defendant's name during the first two weeks of September 1989.

On cross-examination, James stated that he did not know where the defendant got the jacket containing the cocaine, nor did he know to whom it belonged. James could not remember whether the defendant told him that the cocaine was in the jacket.

Dennis Trunkenbrod, a police officer assigned to the drug task force, was assigned to conduct a surveillance on the defendant and James on September 17, 1989. Trunkenbrod followed the James vehicle from Ottawa to Midway airport, where they arrived at approximately 12:30 p.m. At 2:30 p.m., Trunkenbrod saw the defendant and Elizabeth Valera walking in the airport parking lot, at which time Valera had a leather or vinyl jacket draped over her arm. The defendant and Valera left the parking lot two or three minutes after going over to the James vehicle. Valera no longer had the jacket and she was carrying a yellow manila envelope. Trunkenbrod then followed the defendant and Valera into the airport, where he observed the defendant make a phone call. Valera and the defendant then went into a restaurant in the terminal and then to a gift shop where the defendant left Valera. Trunkenbrod followed the defendant back to the James vehicle and he followed the James vehicle back to Ottawa.

On cross-examination, Trunkenbrod testified that although he followed the defendant and James from Ottawa to Midway airport, he did not know whether or not the defendant had a brown leather jacket with him. Trunkenbrod did not put in his report that he saw Valera carrying a brown jacket, although he knew that cocaine had been found in a jacket at the time he wrote the report.

Kenneth Hanford was also a member of the drug task force. On September 17, 1989, he was assigned to conduct surveillance on the James vehicle, which he followed from Ottawa to the Midway airport parking lot. Thereafter, he lost sight of the defendant and did not see him again until 20 minutes later in the airport terminal. During that 20-minute period, no one on the investigative team knew the defendant's whereabouts. Hanford later left the terminal and proceeded to take up surveillance of the James vehicle. The next thing he recalls

happening is the James vehicle leaving the parking lot and going back to Ottawa, where he participated in the arrest of the defendant.

James Girton, another member of the drug task force, testified that he was part of the surveillance team and he arrived at Midway airport at 3 p.m. When Girton arrived he went to the James vehicle, where James showed him the cocaine in the coat. He then entered the airport and observed the defendant and Valera at a restaurant and later at a gift shop. The defendant left the airport and Girton went to gate 7A of Southwest Airlines, where Valera was standing in a check-in line, at which time he confronted Valera along with Officers Strack and Johnson. Girton then left the airport and returned to Ottawa. He participated in the arrest of the defendant and searched the coat the defendant was carrying after leaving James' vehicle. Girton found a plastic bag containing cocaine in a pocket of the coat.

Greg Johnson, another member of the drug task force, also followed the James vehicle to Midway airport. Johnson entered the airport terminal and saw the defendant 15 or 20 minutes later talking on the phone. Johnson later observed the defendant and Valera at a restaurant and a gift shop. Johnson left the area to answer a page, and the next time he saw Valera, she was standing in line at gate A-7 of Southwest Airlines. He then approached Valera and took her to a security office where she produced an airline ticket. Johnson searched Valera's purse and found a yellow Hallmark bag which contained money.

On cross-examination, Johnson testified that he lost sight of the defendant when he left the lobby area and had no idea where the defendant was for 25 minutes. The next time he saw the defendant was when defendant was with Valera in the terminal at the restaurant and gift shop. At no time did he see Valera hand anything to the defendant. Johnson never saw Valera get off an airplane and he had no idea how she got to the airport. Although Johnson found what appeared to be a Southwest Airlines ticket, he did nothing to verify that the ticket had actually been issued by the airline.

Rodney Strack, yet another member of the drug task force, was the final witness to testify. Strack approached Valera as she stood in a departure line at Southwest Airlines and escorted her to a security office where Valera consented to a search of her purse and jacket. Valera produced an airline ticket issued in her name indicating passage on a flight from Houston to Midway and a return flight to Houston that same day. Inside Valera's purse was a yellow Hallmark bag containing $3,270 in currency. One thousand dollars was identified as the

same money given to Charlene Bennett by the police which she subsequently gave to the defendant on September 16, 1989.

On cross-examination, Strack testified that when he searched Valera's purse he did not find any type of boarding pass and Strack did not know if the ticket Valera had was valid. Strack had no knowledge of how Valera arrived at the airport that day nor did he ever see Valera hand anything to the defendant.

In addition to the testimony presented above, the parties stipulated that the bag found in the jacket pocket contained 122 grams of 94% pure cocaine. After defendant's motion for a directed verdict was denied, the defense rested without presenting any evidence. The trial court found the defendant guilty on each count of the indictment.

The defendant first contends that he was not proved guilty beyond a reasonable doubt of controlled substance trafficking. Defendant argues that there was insufficient evidence to show that the cocaine came from outside the State, that the trial court improperly relied upon the unauthenticated airline ticket held by Valera, and that the State failed to prove that the offense was committed in La Salle County. We find that the State failed to prove that the offense of controlled substance trafficking was committed in La Salle County and we reverse on that ground.

■ "In Illinois, venue is a material allegation which must be proved beyond a reasonable doubt along with the other elements of an offense." (*People v. Hagan* (1991), 145 Ill. 2d 287, 300, 583 N.E.2d 494, 500.) Venue may be proved by either direct or circumstantial evidence. (*People v. Nash* (1991), 221 Ill. App. 3d 544, 582 N.E.2d 308.) To determine where an offense was committed for purposes of venue, a court must determine where the acts which constitute the offense occurred. (*Hagan*, 145 Ill. 2d 287, 583 N.E.2d 494.) The elements of controlled substance trafficking, as charged in the indictment, are: (1) knowingly causing to be brought into this State; (2) with the intent to deliver; (3) a controlled substance. Ill. Rev. Stat. 1989, ch. 56½, par. 1401.1(a); see *People v. Frieberg* (1992), 147 Ill. 2d 326, 589 N.E.2d 508.

■ The State argues that the offense was committed in La Salle County because the evidence shows that Ottawa was the defendant's "base of operations" and that he intended to deliver the cocaine to Bennett and James in Ottawa. We note, however, that delivery is not an element of the offense and "intent to deliver" simply describes the mental state which must be proved to sustain a conviction. We believe that the critical element for venue purposes in a prosecution for controlled substance trafficking is where the defendant committed the act

of causing the drugs to be brought into the State. While the circumstances of defendant's meeting with Valera at Midway could give rise to a reasonable inference that defendant arranged to have Valera deliver the cocaine, there is no indication of how, when or where such an arrangement was made. In short, the State failed to present any evidence that the defendant was in La Salle County when he contacted his source of cocaine and arranged to have Valera bring the drugs into Midway airport. Under these circumstances we find that the State failed to prove that the offense was committed in La Salle County, and we reverse defendant's conviction for controlled substance trafficking and vacate his sentence for that offense. We note parenthetically that the venue provision of the Criminal Code has been amended to permit a person charged with controlled substance trafficking to be tried in any county. (Ill. Rev. Stat. 1991, ch. 38, par. 1—6(r).) The amendment is not applicable to this defendant, however, since it did not take effect until January 1, 1992.

The defendant also contends that he was improperly convicted of calculated criminal drug conspiracy because one of the alleged conspirators was an agent of the State. A person commits the offense of calculated criminal drug conspiracy when: (1) he violates any of the provisions of subsection a or b of section 401 (manufacture or delivery, or possession with intent to manufacture or deliver certain controlled substances, including cocaine) or subsection a of section 402 (possession of controlled substances); (2) the violation is part of a conspiracy undertaken or carried on with two or more other persons; and (3) he obtains anything of value greater than $500 from, or organizes, directs or finances such violation or conspiracy. (Ill. Rev. Stat. 1989, ch. 56½, par. 1405(b).) The indictment charged that on or about September 17, 1989, the defendant conspired with Elizabeth Valera and Charlene Bennett to possess cocaine with the intent to deliver and he received more than $500 from the conspiracy. Defendant argues that the evidence clearly shows that Charlene Bennett was acting as an agent of the State prior to September 17 and therefore she could not have been the third conspirator necessary to prove a calculated criminal drug conspiracy. We agree.

A principal distinguishing feature of a calculated criminal drug conspiracy is that it requires a minimum of three conspirators while a simple conspiracy requires only two. (*People v. Harmison* (1984), 124 Ill. App. 3d 236, 463 N.E.2d 1373, *aff'd* (1985), 108 Ill. 2d 197, 483 N.E.2d 508.) To prove a calculated criminal drug conspiracy, the State must establish that all three conspirators agreed together to the commission of the same offense. (*People v. Melgoza* (1992), 231 Ill. App.

3d 510, 595 N.E.2d 1261.) In *People v. Foster* (1983), 99 Ill. 2d 48, 457 N.E.2d 405, our supreme court affirmed the reversal of a defendant's conviction for simple conspiracy where the other party to the alleged conspiracy only feigned agreement and informed the police of the defendant's plan to commit robbery. The court held that the conspiracy statute encompassed a bilateral theory which required the agreement of at least two persons to support a conviction. The bilateral theory also applies to the calculated criminal drug conspiracy statute and requires that the defendant agree with two or more other persons. *People v. Harmison* (1985), 108 Ill. 2d 197, 483 N.E.2d 508.

■ It is clear that Bennett did not agree with the defendant or Valera to commit an offense on September 17, 1989. Bennett was arrested on September 15 and attempted to set up a controlled buy while wearing a recording device on September 16. It is evident that any "agreement" between the defendant and Bennett regarding the September 17 delivery was merely a ruse by Bennett. The State maintains, however, that the defendant was involved in a continuing conspiracy with Bennett and Valera to sell cocaine. While that may be true, the basis of the calculated criminal drug conspiracy indictment was the defendant's possession of the cocaine delivered on September 17, not some other uncharged and unspecified offense. "To sustain a conviction for conspiracy, the object of the conspiracy has to be proved as laid out in the indictment." (*People v. McChristian* (1974), 18 Ill. App. 3d 87, 90, 309 N.E.2d 388, 391, aff'd sub nom. *People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804.) "It is not sufficient to sustain a conviction on a particular charge to prove that the defendant is guilty of some other charge or of generally bad and criminal conduct, but the proof must establish his guilt of a particular charge in the indictment." (*People v. Mader* (1924), 313 Ill. 277, 285, 145 N.E. 137, 140.) We find that there was insufficient proof of a genuine agreement between the defendant, Bennett and Valera as charged in the indictment. The defendant's conviction for calculated criminal drug conspiracy is reversed and his sentence for that offense is vacated.

The defendant next maintains that his conviction for simple conspiracy was barred by Wharton's Rule or was preempted by the calculated criminal drug conspiracy statute. Defendant was charged with conspiracy by agreeing with Elizabeth Valera to deliver a controlled substance. The indictment alleged that as an act in furtherance of their agreement defendant gave Valera $3,270 in exchange for 120 grams of cocaine. Although defendant was found guilty of this offense, no judgment or sentence was entered because the trial court

found that the conspiracy charge merged into the conviction for calculated criminal drug conspiracy.

■ The State, citing *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223, argues that the defendant may not appeal his conspiracy conviction because the final judgment in a criminal case is the sentence, and absent the imposition of a sentence, no appeal can be heard. We find, however, that the situation in this case is similar to that presented in *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540. In *Scott* the defendant was found guilty of two counts of armed robbery and one count each of rape, aggravated battery and aggravated kidnapping. The trial court found that the aggravated kidnapping conviction merged into the rape conviction and imposed no sentence on the kidnapping charge. The appellate court affirmed the defendant's convictions but remanded the cause to the circuit court for entry of a sentence on the aggravated kidnapping conviction. Before the supreme court, the defendant contended that the appellate court exceeded its powers in remanding the case for imposition of a sentence on the aggravated kidnapping charge. The court stated:

> "[T]he question presented is whether, having before it the defendant's appeal seeking reversal of the conviction for aggravated kidnapping, the appellate court was empowered to remand the cause for imposition of sentence. *** [W]e hold that in remanding the cause to the circuit court for entry of a sentence on the aggravated kidnapping conviction the appellate court acted with the scope of its powers." (*Scott*, 69 Ill. 2d at 87-88, 370 N.E.2d at 542.)

(See also *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180.) Based on *Scott* and *Dixon* we find that the issue of defendant's conspiracy conviction is properly before this court.

■ Defendant first contends that his conspiracy conviction was barred by Wharton's Rule. Wharton's Rule provides that an agreement by two people to commit a crime cannot be prosecuted as a conspiracy when the crime necessarily requires the participation of two people for its commission. (*Iannelli v. United States* (1975), 420 U.S. 770, 43 L. Ed. 2d 616, 95 S. Ct. 1284.) The rule currently has vitality only as a judicial presumption to be applied in the absence of legislative intent to the contrary. (*Iannelli*, 420 U.S. at 782, 43 L. Ed. 2d at 625, 95 S. Ct. at 1292; *People v. Melgoza* (1992), 231 Ill. App. 3d 510, 595 N.E.2d 1261; *People v. Laws* (1991), 224 Ill. App. 3d 167, 586 N.E.2d 453, *appeal allowed* (1992), 145 Ill. 2d 640, 596 N.E.2d 634.) The committee comments to the conspiracy statute demonstrate that the statute was intended to eliminate Wharton's Rule:

"Since, under 8—2(a), conspiracy is committed when (with the required intent) there is an agreement to commit *any* offense, this eliminates in Illinois the application of the so-called 'Wharton Rule' in conspiracy, which says that if the object of the agreement is a crime which (by its very nature) requires two or more persons to commit it, then the agreement does not amount to conspiracy because no greater danger is presented by the plurality of actors in the conspiracy than would be presented to the community in the commission of the principal offense. (*E.g.*, gambling at cards, dueling, bigamy, etc.) (See People v. Purcell, 304 Ill. App. 215, 26 N.E.2d 153 (1940).) The Committee felt that the Wharton Rule fails to take into account the preventive aspect of prosecuting conspiracies, that is, to discourage the more dangerous criminal activity of several persons by punishing the preliminary agreement to engage in such activity. That the criminal activity is of such nature as to inevitably require more than one person in its accomplishment seems the more reason to punish the preliminary agreement to undertake it. Section 8—2 is intended to abrogate the Wharton Rule in Illinois, and the holding in People v. Purcell, *supra*." (Emphasis added.) Ill. Ann. Stat., ch. 38, par. 8—2, Committee Comments, at 474 (Smith-Hurd 1989).

Despite this manifestation of legislative intent, this court affirmed the dismissal of an indictment for conspiracy to deliver cannabis on the basis of Wharton's Rule in *People v. Urban* (1990), 196 Ill. App. 3d 310, 553 N.E.2d 740. *Urban* did not note the nature of the rule as a judicial presumption, nor did it refer to the committee comments set out above. Under the circumstances, we believe that *Urban* should be limited to its facts, and we hold that defendant's conspiracy conviction in this case was not barred by Wharton's Rule. See *Melgoza*, 231 Ill. App. 3d 510, 595 N.E.2d 1261 (finding that the legislative intent expressed in the conspiracy statute defeated the presumption of Wharton's Rule); *Laws*, 224 Ill. App. 3d 167, 586 N.E.2d 453 (declining to follow *Urban*).

The defendant also contends that the calculated criminal drug conspiracy statute preempts the general conspiracy statute, again relying on *Urban*, as well as *People v. Caryl* (1977), 54 Ill. App. 3d 537, 369 N.E.2d 926, and *People v. Taylor* (1974), 18 Ill. App. 3d 480, 309 N.E.2d 595. In *Taylor*, the court held that section 9 of the Cannabis Control Act (Ill. Rev. Stat. 1975, ch. 56½, par. 709) preempted the general conspiracy provision of the Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 8—2). Section 9 defines the offense of calculated

criminal cannabis conspiracy, which consists of substantially the same elements comprising the offense of calculated criminal drug conspiracy. The *Taylor* court held that the Cannabis Control Act preempted *any* conspiracy charge involving cannabis even though section 9 did not apply to a conspiracy involving less than 30 grams or more than 500 grams of cannabis.

In *Caryl*, the defendants were indicted under the general conspiracy statute for conspiracy to deliver more than 10 grams but not more than 30 grams of cannabis. In reversing the dismissal of the indictment, the *Caryl* court expressed its disagreement with *Taylor* and stated:

> "The cannabis conspiracy statute is specific as to the quantities it speaks to, and it excludes other conspiracy prosecution within those quantities; however, it is our opinion that it was not the legislature's intention to exclude the quantities in question from conspiracy prosecution. Absent section 9 of the Act, the general criminal conspiracy statute would apply to all cannabis conspiracies. With section 9, the general criminal conspiracy statute cannot apply where the specific statute speaks, but we hold that it still applies where the specific statute is silent." *Caryl*, 54 Ill. App. 3d at 539, 369 N.E.2d at 927.

■ We agree with the reasoning of the *Caryl* court that a specific statute, such as the calculated criminal drug conspiracy statute at issue here, preempts a prosecution under the general conspiracy statute only to the extent the specific statute is applicable. In this case, while the amount of cocaine falls within the ambit of the calculated criminal drug conspiracy statute, that statute is nevertheless inapplicable because this conspiracy involved only two people. As we indicated earlier, a conviction under the calculated criminal drug conspiracy statute requires a minimum of three conspirators. Since the specific statute is silent with regard to a conspiracy involving only two persons, we hold that such a conspiracy may be prosecuted under the general conspiracy statute. (See *Melgoza*, 231 Ill. App. 3d 510, 595 N.E.2d 1261 (Cannabis Control Act did not preempt general conspiracy statute where alleged conspiracy involved only two people).) We note that this court's decision in *Urban*, which found that the Cannabis Control Act preempted the general conspiracy statute, is consistent with our decision here, since the conspiracy charge in *Urban* involved three people. (*Urban*, 196 Ill. App. 3d 310, 553 N.E.2d 740.) The defendant's conviction for conspiracy to deliver a controlled substance is affirmed and the cause is remanded to the circuit court for sentencing on that offense. (See *Scott*, 69 Ill. 2d 85, 370 N.E.2d 540.) In addition, since

defendant has not challenged his conviction for possession of a controlled substance with intent to deliver, it is also affirmed.

Defendant next argues that the sentences imposed upon him are "disproportionately excessive." Because we have vacated defendant's sentences for controlled substance trafficking and calculated criminal drug conspiracy, we only consider defendant's 25-year sentence of imprisonment for possession of a controlled substance with intent to deliver. While not entirely clear, the defendant does not appear to argue that the trial court abused its discretion in imposing a 25-year term. Rather, defendant apparently contends that the range of penalties established by the legislature for the instant offense is disproportionate in comparison to the potential penalties for such offenses as first degree murder, armed robbery and criminal sexual assault. According to defendant, these latter offenses "arguably *** constitute a greater threat to the public well being."

■ The legislature has the constitutional power to define conduct constituting a crime and to specify the nature and extent of punishment for a particular offense. (*People v. Steppan* (1985), 105 Ill. 2d 310, 473 N.E.2d 1300.) In exercising this power, however, the Illinois Constitution requires the legislature to consider the goals of restoring an offender to useful citizenship and of determining penalties in accordance with the seriousness of the offense. (Ill. Const. 1970, art. I, §11; *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.) Because the legislature is more capable than the courts of gauging the seriousness of various offenses (*Steppan*, 105 Ill. 2d 310, 473 N.E.2d 1300), its judgment with respect to criminal penalties will not be interfered with by the courts unless the punishment is cruel, degrading or so wholly disproportionate to the offense that it shocks the moral sense of the community (*Steppan*, 105 Ill. 2d 310, 473 N.E.2d 1300; *People v. Castro* (1987), 151 Ill. App. 3d 664, 503 N.E.2d 376).

The sentencing range for possession with intent to deliver more than 100 grams but less than 400 grams of cocaine is 9 to 40 years. (See Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(B).) We do not find that such a penalty is disproportionate to the seriousness of the offense. Possession, use and distribution of illegal drugs has been said to represent one of the greatest problems affecting the welfare of our society. (*Harmelin v. Michigan* (1991), 501 U.S. 957, 996, 115 L. Ed. 2d 836, 870, 111 S. Ct. 2680, 2705 (Kennedy, J., concurring in part, joined by O'Connor and Souter, JJ.).) Although the defendant perceives murder, armed robbery and sexual assault as more serious threats to the public, the legislature's determination that certain drug offenses present similar or greater dangers is reasonable in view of

the "direct nexus between illegal drugs and crimes of violence" (*Harmelin*, 501 U.S. at 996, 115 L. Ed. 2d at 870, 111 S. Ct. at 2706).

■■ Finally, in the event that we may have misperceived the defendant's argument regarding his sentence, we consider whether the trial court abused its discretion. It is the trial court's task to fashion a sentence which strikes the appropriate balance between protection of society and rehabilitation of the defendant (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541) and that determination will not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882). Our review of the record indicates that the court considered the presentence investigation report and the relevant statutory factors in aggravation and mitigation. In particular, the court noted the defendant's prior drug-related conviction, the need to deter others, the character and attitude of the defendant and the hardship imposed upon defendant's family. We find no abuse of discretion, and we affirm the defendant's sentence of 25 years' imprisonment for possession of a controlled substance with intent to deliver. Cf. *People v. Bradford* (1989), 187 Ill. App. 3d 903, 543 N.E.2d 918.

For the reasons stated above, we affirm the defendant's conviction and sentence for possession of a controlled substance with intent to deliver. We also affirm the defendant's conviction for simple conspiracy and remand to the trial court for sentencing on that offense. The defendant's convictions for controlled substance trafficking and calculated criminal drug conspiracy are reversed and his sentences for those offenses are vacated.

Affirmed in part; reversed in part and remanded.

McCUSKEY and STOUDER, JJ., concur.